**In re D.J. MANAGEMENT GROUP, INC., Debtor.**

**Mark S. WALLACH, Trustee, Plaintiff,**

v.

**VULCAN STEAM FORGING CO., INC., Defendant.**

**Bankruptcy No. 90–11724 K.**
**Adv. No. 93–1069 K.**

United States Bankruptcy Court,
W.D. New York.

March 9, 1994.

See also, 161 B.R. 5.

William R. Crowe, Penney, Maier, Mandel, Wallach & Crowe, Buffalo, for plaintiff Mark S. Wallach, Trustee.

Mark J. Schlant, Zdarsky, Sawicki & Agostinelli, Buffalo, for defendant Vulcan Steam Forging Co., Inc.

## DECISION AFTER TRIAL

MICHAEL J. KAPLAN, Chief Judge.

### 1. Background

This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) wherein a Chapter 7 Trustee seeks to recover preferential payments to a trade supplier under 11 U.S.C. § 547. The Debtor filed a petition under Chapter 11 of the Bankruptcy Code on June 8, 1990, and converted to Chapter 7 on June 25, 1992. During the 90 days preceding the filing of the Chapter 11 Petition, the Debtor had paid to the defendant checks totalling $6,586.63 in satisfaction of earlier invoices, and that is the amount which the Trustee initially sought to recover. After discovery, the Trustee re-

duced this demand to $5,910.63 plus interest. In light of pre-trial proceedings, it is established that the payments satisfied all elements of 11 U.S.C. § 547(b), establishing them as avoidable preferences. The sole issue remaining for resolution at trial was that of whether the payments were immune from preference attack under the "ordinary course of business exception" to the preference provision, which exception is contained at 11 U.S.C. § 547(c)(2).[1]

It is the defendant, not the plaintiff trustee, that "has the burden of proving the non-avoidability of a transfer under subsection (c)" of § 547.[2] The matter was tried to the Court on February 24, 1994, and was taken under submission.

The Court finds that the defendant Vulcan Steam Forging has failed to carry the burden of proving the non-avoidability of the transfers.

The following constitutes the Court's findings of fact, conclusions of law and decision.

### 2. Analysis

Few issues in Bankruptcy Law are as unsettled in this Circuit as is the question of how one defines the "ordinary course of business" and "ordinary business terms" for purposes of 11 U.S.C. § 547(c)(2), which immunizes "ordinary" pre-petition payments by a debtor to a creditor from attack as "preferential transfers."

As Judge Posner described on behalf of the Seventh Circuit Court of Appeals:

When, within 90 days before declaring bankruptcy, the debtor makes a payment to an unsecured creditor, the payment is a "preference," and the trustee in bankruptcy can recover it and thus make the creditor take pot luck with the rest of the debtor's unsecured creditors. 11 U.S.C. § 547. But there is an exception if the creditor can show that the debt had been

incurred in the ordinary course of business of both the debtor and the creditor, § 547(c)(2)(A); that the payment, too had been made and received in the ordinary course of their businesses, § 547(c)(2)(b); and that the payment had been "made according to ordinary business terms" § 547(c)(2)(C). The first two requirements are easy to understand: of course to defeat the inference of preferential treatment the debt must have been incurred in the ordinary course of business of both debtor and creditor and the payment on account of the debt must have been in the ordinary course as well. But what does the third requirement—that the payment have been "made according to ordinary business terms"—add ? and in particular does it refer to what is "ordinary" between this debtor and this creditor, or what is ordinary in the market or industry in which they operate? The Circuits are divided on this question, ... the scholarly literature inconclusive, ... [the Seventh Circuit] undecided, ... [and] the Bankruptcy Judges divided.

*Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir.1993) [citations omitted].

Some of the various approaches and conflicting viewpoints have been described at length in numerous cases. Particularly useful is that synopsis offered by the District Court for the District of Kansas, in the case of *In re Classic Drywall, Inc.*, 121 B.R. 69 (D.Kan.1990). See also *In re Tolona Pizza Products*, 3 F.3d 1029, *In re Fred Hawes Organization, Inc.*, 957 F.2d 239 (6th Cir. 1992), *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494 (8th Cir.1991), and *In re U.S.A. Inns of Eureka Springs, Arkansas*, 9 F.3d 680 (8th Cir.1993). Dozens, if not hundreds, of other cases have interpreted the (c)(2) defense.

As originally enacted in 1978, and until amended in 1984, the statute read differently in that it required that the payment must have been "made not later than 45 days after such debt was incurred."

---

1. The statute provides, in pertinent part, "(c) The trustee may not avoid under this section a transfer—(2) to the extent that such transfer was—(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms."

2. 11 U.S.C. § 547(g).

At risk of gross oversimplification, I will describe the problem before the Court thusly:

1.) Preferences favor certain creditors over others, and since they are transfers of money or property of an insolvent, they can precipitate bankruptcies (by leaving the debtor under-capitalized) as well as forestall them (by maintaining the good will of suppliers or other preferred creditors).

2.) Preferences are made recoverable in bankruptcy in order to undo any inequities therein.

3.) Since there is no penalty for receiving a preference (and that is as it should be), preference law does not in fact deter preferences except to the extent that knowledgeable transferees try to make the preferential transfers unactionable either by lapse of time (lapse of the statutory 90–days before the filing of the bankruptcy period) or by contriving to bring them within exceptions.

4.) Under the 1898 Bankruptcy Act, preferential transfers to non-insider employees and to trade and utility suppliers were typically not avoidable for a number of good reasons: in effect those transferees provided ongoing "new" value or they lacked the "reasonable cause to believe that the debtor was insolvent," that was an element of the cause of action the trustee was required to prove. (Sec. 60b of the Act of 1898). The ongoing delivery of labor, utilities, or inventory in exchange for ordinary payments may be desirable because it may help a debtor avoid bankruptcy. Furthermore, value possibly is being added to the debtor's estate in reasonable relation to what the debtor is paying, and ongoing payments might not have inequitable effect if bankruptcy ensues.

5.) In the Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 137, 93rd Cong., 1st Sess. (1973) it was proposed that preferences be made avoidable despite the transferee's lack of knowledge of the debtor's insolvency.[3]

6.) Removing the "reasonable cause to believe" element of the preference cause of action placed at risk those workers and providers of utilities and inventory who were previously not at risk. To protect payments to workers, utilities and trade suppliers, the Commission proposed to

A. Codify a view (the "Modified Net Result Rule") that those who receive an avoidable preferential payment should have an offset for new, unpaid credit granted to the debtor thereafter, and

B. Exclude from the "antecedent debt" element of an avoidable preference, payments for labor, utilities or inventory, that were delivered within three months of the payment.[4]

7.) In the Bankruptcy Reform Act of 1978, Congress adopted the first proposal (it became 11 U.S.C. § 547(c)(4)) but modified the second. At 11 U.S.C. § 547(c)(2) Congress did not limit the immune payments to those for labor, utilities or inventory, it instead broadened it to all "ordinary course of business" obligations. But Congress limited the immunity to payments made within 45 days of the date the obligation was incurred. Congress offered no guidance as to why it changed the Commission's recommendations in these regards.

8.) In at least one case it was said that the 45–day rule was a limited codification of the pre-Code view that making "current payments" on "current expenses" does not give rise to preferences. Forty-five days was viewed as a "normal trade cycle," and consequently even "ordinary" payments on long-term debts (as opposed to "current expenses") were held not to fall within the protection of the § 547(c)(2) defense.[5]

9.) In 1984, Congress amended § 547(c)(2) to eliminate the 45–day requirement, offering no decisive guidance as to why it was doing so.

10.) Thus, the United States Supreme Court has recently rejected the view that § 547(c)(2) as so amended continued a codification of the "current expense" rule, and it

---

3. See proposed Section 4–607 of the Bill contained in the Commission Report.

4. See proposed section 4–607(c)(2), (g)(1).

5. *Barash v. Public Finance Corp.*, 658 F.2d 504 (7th Cir.1981).

rejected the view that long-term debt is not included within the scope of the protection afforded by the (c)(2) defense as it now exists.[6]

As recently asked by one commentator,[7]

1. Which industry is the relevant industry and how does a Bankruptcy Court decide on an industry standard when an industry has no single trade practice?

2. What proof is necessary to prove an industry standard?

3. To what degree will an Appeals Court upset the factual determinations of a trial court on this issue?

### 3. Findings

Again we turn to Judge Posner:

"Not only is it difficult to identify the industry whose norm shall govern (is it, here, the sale of sausages to makers of pizza?, the sale of sausages to anyone?, the sale of anything to makers of pizza?) but there can be great variance in billing practices within an industry. Apparently there is in this industry, whatever exactly 'this industry' is; for while it is plain that neither [the creditor] nor its competitors enforce payment within 7 days it is unclear that there is a standard outer limit of forbearance. It seems that 21 days is a goal, but payment as late as 30 days is generally tolerated and that for good customers even longer delays are allowed.... The law should not push businessmen to agree upon a single set of billing practices; anti-trust objections to one side, the relevant business and financial considerations vary widely among firms on both the buying and the selling side of the market." *Tolona* at 1033.

■ In the case presently at bar, the defendant Vulcan Steam Forging asks the Court to rule, in essence, that the "industry" whose "ordinary business terms" it must establish for purposes of § 547(c)(2)(C) is that

of local (Buffalo) suppliers of custom steel forgings to brokers of steel forgings who, like the Debtor, do government work and who suffer cash flow consequences. Vulcan bluntly asserts that it alone "is" the relevant industry since it is the only Buffalo supplier of steel forgings on such terms. This Court believes that to define "ordinary business terms" in terms of the practices of one who deals on terms on which no-one else will deal, would reduce § 547(c)(2)(A) to an oxymoron. Vulcan asks the Court to rule that those who deal in extra-ordinary terms constitute their own industry, in which the extra-ordinary becomes "ordinary."

Congress enacted § 547 for application in the real world, not Wonderland or Oz. The argument is rejected. If Vulcan is to prevail it must establish that the terms here were ordinary for the steel forgings industry.

The Court will now proceed with findings of fact.

1. The Debtor, D.J. Management Corp., Inc., formerly known as American Women Metals[8] was a broker of steel forgings. It obtained orders for custom steel forgings from private-sector manufacturers as well as from government contractors such as shipyards working on defense contracts. It turned to suppliers like Vulcan to fill those orders.

2. During the last year before the Debtor filed its Chapter 11 petition, it was ordering forgings from Vulcan twice a month, on average.

3. Most of the Debtor's orders from Vulcan were for forgings ordered in connection with "government contract work," for which the Debtor typically remained unpaid by its own customers for 60 to 70 days after it was invoiced by its suppliers, like Vulcan. Because of the delay in the Debtor's receipt of payments from its customers, cash-flow considerations forced the Debtor to pay 60, 70 or

6. *Union Bank v. Wolas,* —— U.S. ——, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991).

7. Putting the Ordinary in the Ordinary Course of Business Defense: *In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.,* Norton Bank. Law Advisor (CBC) No. 2 at 6 (Feb.1994).

8. "American Women" had reference to the fact that this was a business owned by women, apparently entitled to certain considerations in government contracting on that basis.

more days after it was invoiced by its suppliers like Vulcan. The stated invoice terms from Vulcan were 30 days. However, Vulcan typically ignored those terms and "normally" extended to its broker-customers who do government work, unwritten grace that amounted to 60 or 70–day terms.

4. Because the Debtor was ordering new goods from Vulcan so frequently, it was never necessary for Vulcan to call the Debtor looking for payment on account of invoices that had passed the 60 or 70–day mark. Rather, Vulcan would examine the aging of the "AWM" (American Women Metals) receivables each time AWM sought to place a new order for goods on credit, and Vulcan would ask AWM whether it could make a payment on its account.

5. In reliance on the promise of each such payment on account, Vulcan would accept the new order. In reliance on the stream of payments, it delivered more goods on credit.

6. The payments thus received by Vulcan each typically satisfied a number of outstanding invoices. For example, the payment received by Vulcan on February 8, 1989 satisfied six invoices ranging in age from 57 days to 91 days from the invoice date; the payment received on March 17, 1989 satisfied three invoices ranging in age from 47 days to 95 days; the payment received on May 5 satisfied two invoices, one of which was 72 days old and the other was 79 days old; the payment received on June 6 paid a single 73 day old invoice; the payment received on August 14, 1989 satisfied three invoices ranging in age from 62 days to 86 days; the September 18, 1989 payment satisfied a single 75 day old invoice; the payment on October 12 paid a 62 day old invoice; the payment received on November 1, 1989 satisfied a 51 day old invoice and a 54 day old invoice; and so forth.

7. At issue in the present action are the payments received by Vulcan in the 90 days before the Chapter 11 petition was filed on June 8, 1990. Those payments were a $556 payment received by Vulcan on March 28, 1990 satisfying a 65 day old invoice, a $278 payment received on April 11, 1990 satisfying a 58 day old invoice and a $5,752.63 payment received on May 23, 1990 satisfying three invoices—a 25 day old invoice for $676, a 74 day old invoice for $214.63, and a $4,862 invoice that was 91 days old.

8. When the Debtor filed its Chapter 11 petition on June 8, 1990, it had dozens of trade creditors, to whom many thousands of dollars of debt were owed. Although Vulcan was among them, Vulcan was shortly thereafter fully paid for all of its pre-petition deliveries; that "post petition preference," unauthorized under 11 U.S.C. § 549, cannot be recovered because of the expiration of the two year limitations pertaining thereto contained in § 549(d). Had the post-petition payment not occurred, Vulcan would have a § 547(c)(4) "new value" defense, to the present preference to that dollar amount.

### 4. Conclusions

■ Finding itself, thus, without a (c)(4) defense, Vulcan turns to (c)(2). But the only testimony offered in support of the proposition that the course of dealing between AWM and Vulcan was one which fell within "ordinary business terms" for the industry was the self-serving testimony of the president of Vulcan, in which he claims to have industry-wide contacts, through trade groups and associations, with the heads of larger "shops" all around the country. While the Court is not prepared to rule out the possibility that such self-serving testimony may, of itself, suffice to prove what "ordinary business terms" are for the industry[9] when there is no evidence to the contrary, such testimony falls short here because of contradictory facts

9. Consider, for example, *In re Classic Drywall, Inc.,* 121 B.R. 69 (D.Kan.1990) wherein the testimony of an officer of the preferred creditor was alone sufficient, and also *In re U.S.A. Inns of Eureka Springs, Arkansas,* 9 F.3d 680 (8th Cir. 1993) wherein the preferred creditor was a long-term lender and the lending officer's testimony both as to that lender's practice of attempting to "work with" delinquent accounts in the real estate industry and as to such efforts being "common industry practice" was alone sufficient. Compare, however, *In re Fred Hawes Organization, Inc.,* 957 F.2d 239 (6th Cir.1992) wherein the only testimony of practices in the industry came from the preferred creditor whose testimony was found by the Bankruptcy Court to lack credibility and reliability.

in evidence. Specifically, it has been established in evidence that the Debtor attempted to purchase goods from regular suppliers other than Vulcan who demanded cash on delivery or cash in advance.[10] Since the Debtor was unable to meet those terms it would turn to suppliers, like Vulcan, who were "more flexible."[11] (Although no evidence was offered as to price comparability between Vulcan and other suppliers, it might be reasonable to assume that Vulcan's flexibility came at higher cost. Whether it did or did not come at higher cost is not, however, decisive.)

When, as here, the billing terms were "net 30 days," and where there is evidence that some others of the Debtor's suppliers placed the Debtor on a cash-on-delivery or cash-in-advance basis once the Debtor had gone out past 60 days, and where the creditor's own testimony is to the effect that 60 to 70-day terms for its government-broker customers was normal (despite the "net 30" stated terms) but that 80 days warranted corrective action as to customers who were not seeking to make further orders and not, therefore, offering to make payments on account, this constitutes a totality of circumstances whereunder the Court is not persuaded that the payment of invoices more than 70 days old were payments made on "ordinary business terms". Vulcan's president's testimony alone is not enough under these circumstances.[12]

The Court recognizes that courts that have thought it imperative to encourage suppliers to continue to deal with financially troubled debtors have been inclined to expand the purview of the phrase "ordinary business terms" to encompass virtually any terms that are not "unheard of" in the industry. Thus it has been said that "ordinary" does not mean "common"; it can mean "occasional".[13] And it has been said that "only dealings so idiosyncratic as to fall outside that broad range [of ordinary practices] should be deemed extraordinary and therefore outside the scope of subsection (C)."[14] And, "extra-contractual practice" can be elevated into an "ordinary business term."[15]

This Court does not necessarily quarrel with those views, although the Court doubts that exceptions to preference law could (or should) ever "encourage" creditors to do business with troubled debtors so as to forestall bankruptcy.[16] Even if to "forestall" might sometimes be to "avoid" bankruptcy, the goals of preference law and of such efforts may be irreconcilable. Encouraging creditors to so deal may compel precisely the result that preference law seeks to avoid. Thousands of dollars in debts owed to other creditors of the same "class" as Vulcan remained unpaid when this debtor filed its petition in bankruptcy, whereas Vulcan was made whole as to all deliveries made to the Debtor before the filing of the petition. It did tens of thousands of more dollars of business with the Debtor while the Debtor operated in Chapter 11, and Vulcan remains unpaid only as to $5,425.96 for unpaid invoices for goods shipped to the Debtor on credit after the filing of the Chapter 11 petition. As to the latter, Vulcan enjoys an "administrative expense" priority and will receive payment ahead of pre-petition creditors, if enough assets are recovered (by successful prosecution of, among other things, preference actions such as this one) to "reach" Chapter 11 administrative expenses. If the assets are insufficient to "reach" *beyond* Chapter 11 administrative expenses, there

10. Trial testimony of Mr. Carroll, former General Manager of AWM.

11. *Id.*

12. See *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494 (8th Cir.1991) wherein the testimony of the creditor's employees was alone sufficient "[i]n the absence of any contrary evidence." At p. 499.

13. *In re Energy Co-op., Inc.,* 103 B.R. 171 (N.D.Ill.1986).

14. *In re Tolona Pizza Products,* 3 F.3d 1029 (7th Cir.1993); *In re U.S.A. Inns of Eureka Springs, Arkansas,* 9 F.3d 680 (8th Cir.1993).

15. *In re Classic Drywall, Inc.,* 121 B.R. 69 (D.Kan.1990).

16. See *In re Fulghum Construction Corp.,* 872 F.2d 739 (6th Cir.1989) suggesting that the focus must be on the dealings between the debtor and creditor and that the court must encourage short term credit dealings with troubled debtors in order to forestall bankruptcy.

will never be any monies with which to make any distribution to those pre-petition trade creditors who were not so "flexible" and who might have been better off if the Debtor's business failed sooner rather than later.

> [A] possible function of [sub-section C] is to allay the concerns of creditors that one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the others in the event of bankruptcy. It may seem odd that allowing late payments from a debtor would be a way for a creditor to make himself more rather than less assured of repayment. But such a creditor does have an advantage during the preference period, because he can receive late payments then and they will still be in the ordinary course of business for him and his debtor. ... [A pertinent inquiry would be whether] other creditors of [the debtor] would have been surprised to learn that [this supplier] had been so forebearing in its dealings with [the debtor].

*Tolona* at 1033.

The manner in which the Debtor and Vulcan conducted business was such as to ignore the invoice terms and to convert their method of dealing into the archetypical "running account" in which Vulcan demanded payments on account before advancing new credit. The solicitude for such relationships expressed by Congress in the "new value" defense contained in § 547(c)(4) depends upon there being a net result of a gain to the Debtor's estate and a loss to the seller arising out of the post-preference transactions.[17]

■ There is no evidence here that the Debtor and Vulcan engaged in a course of conduct consciously designed to improve Vulcan's position at the expense of other creditors. It is clear, however, that the pre-petition course of dealing together with the post-petition payment did have that effect (if one ignores the speculative value of the opportunity for reorganization gained by the Debtor by virtue of Vulcan's willingness to continue to deal with it.) Preferences are not favored, despite the rhetoric suggesting that "ordinary" dealings during insolvency are to be encouraged. Where, as here, the defendant must establish that its course of dealing was, at the very least, not "idiosyncratic," and where there is undisputed evidence that other vendors in the same industry demanded cash on delivery or cash in advance from this Debtor at the same point in time, the defendant does not prove by a fair preponderance of evidence that the terms were "ordinary" when it seeks to do so only by testimony from its officer that he "knows" such flexibility to be not uncommon in the Debtor's industry. Other creditors who wait for payment are entitled to the benefit of the fact that it is the preferred creditor who must convince the Court that nothing "idiosyncratic" was going on.

■ The Court finds that the $556 payment received on March 28, 1990 and the $278 payment received on April 11, 1990 which satisfied invoices that were 65 days and 58 days old respectively, were on "ordinary business terms" as was $676 of the May 23, 1990 payment, since that satisfied a 25 day old invoice. However, $5,076.63 of the payment received by Vulcan on May 23 satisfied invoices that were 74 days old ($214.63) and 91 days old ($4,862) and it has not been established by a fair preponderance of the evidence that those were payments on "ordinary business terms."

Judgment shall be entered for the Trustee in that amount with interest, upon the Trustee's submission of an affidavit of amount due. The parties shall bear their own costs.

SO ORDERED.

---

17. See the numerous early cases addressing running accounts collected at 4 James M. Henderson, Remington on Bankruptcy § 1719.1 (1957). For example, consider *Jaquith v. Alden*, 189 U.S. 78, 23 S.Ct. 649, 47 L.Ed. 717 (1903); *Willcox v. Goess*, 92 F.2d 8 (2d Cir.1937); *Walker v. Wilkinson*, 296 F. 850 (Ct. of Appeals Texas 1924); *C.S. Morey Mercantile Company v. Schiffer*, 114 F. 447 (8th Cir.1902) all of which involved a net enrichment to the Debtor's estate and either no improvement to the creditor or, indeed, increased indebtedness by the Debtor to the creditor. See also this Court's earlier decision in this Adversary Proceeding at 161 B.R. 5, in which this Court rejected the argument that new credit extended after the preferential payment may be fully paid off later and yet still support "new value" setoff under § 547(c)(4).