**In re LAN YIK FOODS CORPORATION,**
**Debtor.**

**Richard J. McCORD, Trustee, Plaintiff,**

v.

**VENUS FOODS, INC., Defendant.**

**Bankruptcy No. 192–14188–260.**
**Adv. No. 193–1103–260.**

United States Bankruptcy Court,
E.D. New York.

Aug. 2, 1995.

Sonya F. Lorge, Brooklyn, NY, for defendant Venus Foods, Inc.

Robert Owen Senzer, Andrew P. Lederman, Fischbein, Badillo, Wagner, Itzler, New York City, for plaintiff Richard J. McCord.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

CONRAD B. DUBERSTEIN, Chief Judge.

Richard J. McCord, the Chapter 7 Trustee ("Trustee" or "Plaintiff") of Lan Yik Foods Corporation ("Debtor") initiated this adversary proceeding by the filing of a complaint to recover alleged preferential payments pursuant to section 547(b) of the Bankruptcy

Code.[1] According to the complaint, payments in the aggregate amount of $65,178.37 were made by the Debtor to the Defendant, Venus Foods, Inc. ("Venus" or "Defendant") within ninety days preceding commencement of the Debtor's bankruptcy case and that these payments were preferential.

In its answer, Venus disputed the allegation that the subject payments were preferences and further contended that even if they were, such transfers were protected from avoidance and recovery under the ordinary course of business exception of section 547(c)(2) and the new value exception of section 547(c)(4).[2]

This matter having come on for trial and after consideration of the arguments of counsel, the evidence presented, stipulations of fact, briefs and other documents submitted after the trial, this Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52[3] made applicable to this proceeding by Rule 7052.

### FINDINGS OF FACT

1. The Debtor filed a petition for relief under the provisions of chapter 7 on May 15, 1992. Thereafter, pursuant to section 701(a) Plaintiff was appointed by the United States Trustee to serve as the trustee in bankruptcy of the Debtor's estate. Plaintiff accepted the appointment and is currently administering the Debtor's estate pursuant to section 701(c).

2. Debtor was a distributor of Chinese food products having operated since 1978 from premises located at 89 Steuben Street, Brooklyn, New York.

3. Venus, a manufacturer and supplier of Chinese food products, is a California corporation conducting business at 770 Stimson Avenue, City of Industry, California.

4. Prior to the filing of the bankruptcy petition, Venus transacted business with the Debtor as a distributor of wholesale prepared Chinese food products for approximately nine years. During that time Venus issued invoices to the Debtor, which the Debtor would pay. The invoice date was generally the date that the goods were shipped. The Debtor often paid an invoice by making more than one payment over a period of time.

5. Venus' invoices provided for payment terms of net 14 days. However, Venus' vice president, Stanley Chow, testified at the trial that although the company intended at the time the invoices were printed in 1982 to collect payment in 14 days, Venus never received payment in 14 days from any of its customers,[4] and, in general, Venus' payment terms were 60 to 90 days.[5]

6. The 90 day period during which a preference could be effected pursuant to section 547 commenced February 14, 1992 (the "preference period.")

7. Venus submitted into evidence a reconciliation form which compared payments received from the Debtor to invoices for goods shipped in 1991 (the "1991 reconciliation form").[6] This 1991 reconciliation form reflected the payment history for 29 invoices in the pre-preference period and 5 invoices in the preference period.

8. At the post-trial request of the Court, Venus submitted an additional reconciliation form which compared payments received from the Debtor to invoices for goods shipped for the year 1990 (the "1990 reconcil-

---

1. Unless otherwise indicated, subsequent chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

2. The "ordinary course of business" exception and "new value" exception set forth in sections 547(c)(2) and (4) are more thoroughly discussed *infra.*

3. Fed.R.Civ.P. 52 provides, in pertinent part, that "[i]n all actions tried upon the facts without a

jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon. . . ."

4. October 25, 1994 Transcript, p. 44. Hereinafter, all references to the trial transcript will be designated "Tr."

5. Tr. at 33.

6. Tr. at 35.

iation form"). This 1990 reconciliation form reflected the payment history for 45 invoices in the pre-preference year of 1990.

9. Within 90 days of the filing of the Debtor's petition for relief, the preference period, Venus received from the Debtor the following payments aggregating $65,178.37:

| Date | Check No. | Amount |
|---|---|---|
| February 24, 1992 | 8151 | $10,000.00 |
| February 29, 1992 | 8152 | 10,000.00 |
| March 9, 1992 | 8153 | 10,000.00 |
| March 16, 1992 | 8154 | 8,884.75 |
| March 23, 1992 | 8155 | 6,925.10 |
| March 27, 1992 | 8247 | 9,368.52 |
| April 6, 1992 | 8248 | 10,000.00 |
| | Total | $65,178.37 |

10. The foregoing payments were made for the following outstanding invoices:

| Invoice No. | Invoice Date | Invoice Amount |
|---|---|---|
| 25016 | November 11, 1991 | $31,654.70 |
| 25137 | November 22, 1991 | 7,230.05 |
| 25293 | December 10, 1991 | 6,925.10 |
| 25332 | December 13, 1991 | 32,605.40 |
| 25486 | December 30, 1991 | 6,703.12 |
| | Total | $85,118.37 |

11. On March 4, 1993, Plaintiff filed an adversary complaint seeking to recover the amount of $65,178.37 from Venus. The Plaintiff asserts that this amount constitutes several voidable preferences pursuant to section 547(b).[7]

12. In its answer to the complaint, Venus denied that the aforesaid payments made by the Debtor to Venus were preferential but if found to be preferences, the payments are nevertheless insulated from avoidance under the provisions of sections 547(c)(2) and (c)(4).

13. Notwithstanding the alleged preferential transfers in the sum of $65,178.37, Venus filed a non-priority proof of claim as a general unsecured creditor for outstanding sums due from the Debtor in the amount of $92,722.65.[8] Such proof of claim dated June 8, 1992, was not amended nor was it objected to. Thus, if Venus had not received $65,178.37 within the ninety days preceding

Debtor's bankruptcy, it would have been owed $157,901.02.

14. The parties have stipulated that the first four elements of section 547(b) were met, namely, (1) that the aforesaid payments are transfers made for the benefit of a creditor; (2) on account of an antecedent debt; (3) made while the debtor was insolvent; and (4) made within ninety days before the date of the filing of the petition.

15. The parties have not stipulated that Plaintiff has met the fifth element of section 547(b), i.e., that the transfers enabled Venus to receive more than it would receive if the estate were liquidated under chapter 7 and the transfers had not been made.

16. Plaintiff has conceded to Venus' argument that the Debtor received subsequent new value for payments made during the preference period in the amount of $37,474.10 and, therefore, if Plaintiff successfully demonstrates the subject payments to be preferential transfers, $37,474.10 qualifies for exception from avoidance under section 547(c)(4).[9] Accordingly, after offsetting the insulated amount of $37,474.10 from $65,178.37, Plaintiff agrees that the amount of alleged preferential transfers at issue is $27,704.27.

17. At trial, Venus was given the opportunity to supplement its evidence with respect to its section 547(c)(2)(C) defense and did submit post-trial affidavits with respect thereto.

### DISCUSSION

Section 547(b) provides authority for a trustee to avoid and recover prepetition payments or transfers made by a debtor that prefer some creditors over others and is intended to discourage creditors "from racing to the courthouse to dismember the debtor during his slide into bankruptcy...."

---

7. *See* section 547(b) quoted *infra*.

8. Venus' proof of claim was received into evidence as Exhibit D.

9. Section 547(c)(4) provides in pertinent part, as follows:
 (c) The trustee may not avoid ... a transfer—
 (4) to or for the benefit of a creditor, to the extent that after such transfer, such creditor gave new value to or for the benefit of the debtor—
 (A) not secured by an otherwise unavoidable security interest; and
 (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.
 11 U.S.C. § 547(c)(4).

H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6138. As stated by the Supreme Court in *Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2262–63, 110 L.Ed.2d 46 (1990), this authority is provided to foster the Bankruptcy Code's "central policy" of "equality of distribution" among creditors. "According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property." *Id.*

In order to qualify as a preference, transfers of an interest of the debtor's property must meet all of the following elements set forth in section 547(b):

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition; ...

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

■ It is quite clear that in order to avoid a payment as preferential, the trustee or debtor-in-possession bears the burden of establishing each of the elements of section 547(b). *See* 11 U.S.C. § 547(g); *Bluegrass Ford–Mercury, Inc. v. Farmers Nat'l Bank of Cynthiana (In re Bluegrass Ford–Mercury, Inc.)*, 942 F.2d 381, 385 (6th Cir.1991); *Sapir v. Keener Lumber Co., Inc. (In re Ajayem Lumber Corp.)*, 143 B.R. 347, 351 (Bankr.S.D.N.Y.1992); 4 *Collier on Bankruptcy*, ¶ 547.21[5], 547–93 (15th ed. 1994).

Therefore, the threshold determination of whether the payments in issue are avoidable preferences requires this Court to decide whether Plaintiff has proven all of the elements required by section 547(b).

Inasmuch as the parties have stipulated that the first four elements of section 547(b) have been met, at issue is whether Plaintiff has satisfied section 547(b)(5), viz., that the subject payments enabled Venus to receive more than it would have received if the estate were liquidated under chapter 7 and the payments had not been made.

The test for this fifth element was established by the Supreme Court in the seminal case of *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 450–51, 80 L.Ed. 655 (1936).[10] In interpreting the preference provision of the former Bankruptcy Act, the Supreme Court observed that the preferential effect of the payment must be determined "not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results." *Id.*

■ Thus, the section 547(b)(5) evaluation is to be made as of the time the debtor filed its bankruptcy petition. *See Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.)*, 990 F.2d 551, 554 (10th Cir.1993) (*citing Neuger v. United States (In re Tenna Corp.)*, 801 F.2d 819, 822 (6th Cir.1986)); *Clark v. A.B. Hirchfeld Press, Inc. (In re Buyer's Club Mkts., Inc.)*, 123 B.R. 895, 896–97 (Bankr. D.Colo.1991); *Pereira v. United States (In re Rodriguez)*, 50 B.R. 576, 583 (Bankr. E.D.N.Y.1985). Here, the value of payments received by Venus will be judged against a hypothetical liquidation at the time the Debtor filed its petition on May 15, 1992.

The *Palmer Clay* test was applied by the Ninth Circuit in *Elliott v. Frontier Properties (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1421 (9th Cir.1986). There, the court explained that

[t]his analysis requires that in determining the amount that the transfer "enables [the] creditor to receive," such creditor must be charged with the value of what was trans-

---

**10.** Section 547(b)(5) codifies the Supreme Court's holding in *Palmer Clay*.

ferred *plus* any additional amount that he would be entitled to receive from a Chapter 7 liquidation. The net result is that, as long as the distribution in bankruptcy is less than one-hundred percent, *any* payment "on account" to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made.

*Id.; see also Smith v. Creative Fin. Management, Inc. (In re Virginia–Carolina Fin. Corp.)*, 954 F.2d 193 (4th Cir.1992); *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458 (6th Cir. 1991); *Barash v. Public Fin. Corp.*, 658 F.2d 504, 508–9 (7th Cir.1981); *Ellenberg v. Plaid Enters., Inc. (In re T.B. Home Sewing Enters., Inc.)* 173 B.R. 790, 795 (Bankr.N.D.Ga. 1993); 4 *Collier on Bankruptcy* ¶ 547.08 at 547–41 (15th ed. 1994).

■ To support his position that preferential transfers had occurred, the Plaintiff offered the expert testimony of Howard Fishman, a certified public accountant, who testified about the Debtor's books and records and amount of claims filed.[11] Mr. Fishman testified that the Debtor's largest creditor, the Bank of Central Asia was secured for $2,400,000.[12] However, $100,000 collected from receivables, representing cash collateral for its claim, was paid to it thereby categorizing the Bank's claim as undersecured for the remaining $2,300,000 which would be subject to the same dividend, if any, distributed to the general unsecured creditor body. Mr. Fishman concluded that in view of the foregoing unsecured debt as well as priority claims for outstanding taxes, any distribution to unsecured creditors would be "minuscule," if at all.

In addition to the testimony, this Court, in taking judicial notice of the Debtor's chapter 7 case file, notes that the Debtor's schedules showing its financial position as of May 15, 1992, list liabilities totalling $2,319,256.19 and assets totalling $2,191,168.31. Moreover, proofs of claim filed in this case which total $2,317,051.17 encompass $1,763,699.38 in secured claims, $488,815.46 in non-priority unsecured claims, and $64,536.33 in priority unsecured claims. As evidenced by its proof of claim, Venus is a member of the non-priority, unsecured creditor class.

Although the Debtor's schedules list its total assets at $2,191,168.31, the uncontroverted testimony offered at trial revealed that such assets were overstated. Specifically, the Debtor's building, scheduled as a $750,000 asset, was subject to $1 million in mortgages and, moreover, out of $659,167.31 scheduled as accounts receivables, only the $100,000 was collected with no hope for the recovery of the remainder. In sum, with the elimination of Debtor's only two assets, namely, the building and its accounts receivables, the Debtor's sole assets are its preference actions. However, assuming *arguendo* that Plaintiff succeeds in his preference actions, the maximum preference recoveries will nevertheless be insufficient to pay the Debtor's secured and priority unsecured creditors.

Therefore, based upon the evidence introduced at trial as well as the Debtor's schedules and claims register reflecting that the Debtor's liabilities severely outnumber its assets, it is abundantly clear that unsecured creditors would have received less than 100 percent of their claims at the time the Debtor filed its chapter 7 on May 15, 1992.

The conclusion is inescapable that the subject payments enabled Venus, a non-priority unsecured creditor, to receive more than it would have received in a chapter 7 distribution. Accordingly, this Court finds that Plaintiff has met his burden of proof with respect to the fifth element of section 547(b) and, therefore, concludes that the subject payments were preferential transfers as defined by section 547(b).

*Section 547(c) Exceptions*

Plaintiff is entitled to avoid the subject payments unless Venus can show that the transfers fall under one of the exceptions in section 547(c). In its complaint, Venus as-

---

11. At the time of the trial, Mr. Fishman's application to be retained as the accountant for the trustee was pending.

12. The Bank of Asia's claim was secured as follows: $1.6 million in receivables and $800,000 in the Debtor's building.

serts that if the subject payments are deemed preferential transfers, they are, nevertheless protected from avoidance under the ordinary course of business and new value exceptions set forth in sections 547(c)(2) and (c)(4) respectively. As indicated above, Plaintiff has conceded to Venus' section 547(c)(4) new value defense.

*Section 547(c)(2)*

In its attempt to prevent the Plaintiff from avoiding the preferential payments, Venus has raised the shield of the "ordinary course of business" defense set forth in section 547(c)(2), which states:

> (c) The trustee may not avoid under this section a transfer—
>
> .    .    .    .    .
>
> (2) to the extent that such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

■ Section 547(c)(2) protects only ordinary course of business transfers and was intended to "leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual transactions by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5874, 6329. Consequently, section 547(c)(2)'s goal is to "induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy." *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 219 (3d Cir.1994).

■ In order to defeat avoidance, the party asserting the "ordinary course of business" defense must establish each of the elements enumerated in section 547(c)(2). *Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 243–245 (6th Cir.1992) ("In using the conjunctive 'and' between subsections (B) and (C)—rather than the disjunctive 'or'—Congress clearly intended to establish separate, discrete, and independent requirements which a creditor would have to fulfill to prevent avoidance.").

Inasmuch as the Bankruptcy Code does not define "ordinary course of business" or "ordinary business terms," there is no precise legal test which may be applied to determine whether the requirements of section 547(c)(2) have been met. Indeed, as observed by Chief Judge Kaplan in *Wallach v. Vulcan Steam Forging Co., Inc. (In re D.J. Management Group)*, 164 B.R. 831, 833 (Bankr.W.D.N.Y.1994), "[f]ew issues in Bankruptcy Law are as unsettled in this Circuit as is the question of how one defines the 'ordinary course of business' and 'ordinary business terms' for purposes of 11 U.S.C. § 547(c)(2)...." *Id.*

The parties herein do not dispute that the subject payments were made by the Debtor to Venus in payment of debt incurred in the ordinary course of the Debtor's business, namely, as payment for Chinese food products sold by Venus and received by the Debtor. Thus, subsection (c)(2)(A) clearly has been satisfied. What is disputed is whether the subject payments satisfy subsections (c)(2)(B) and (C), i.e., whether the payments were made in the "ordinary course of business" and whether they were made according to "ordinary business terms."

■ Under section 547(c)(2)(B), a subjective inquiry is made as to whether the payment of a debt was made in the ordinary course of business of the debtor and the transferee. *See Fred Hawes*, 957 F.2d at 244. It is therefore necessary for this Court to look at the prior course of conduct which existed in the Debtor's and Venus' relationship.[13]

---

13. *See WJM Inc. v. Massachusetts Dep't of Pub. Welfare*, 840 F.2d 996, 1011 (1st Cir.1988) ("[T]he cornerstone of this element of a preference defense is that the creditor needs to demon-

This subjective inquiry into "ordinariness" suggests some consistency with other business transactions between the parties rather than a rigid similarity to past transactions. *See National Enterprises, Inc. Liquidating Trust v. Associates Leasing, Inc. (In re National Enterprises )*, 172 B.R. 829 (Bankr.E.D.Va.1994); *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 96 B.R. 474 (D.N.J.1988) *aff'd* 891 F.2d 66 (3d Cir.1989); *Richardson v. Philadelphia Housing Authority (In re Richardson )*, 94 B.R. 56, 60 (Bankr.E.D.Pa.1988). It is to be noted that "[e]ven if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of [section] 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties." *Waldschmidt v. Ranier (In re Fulghum Construction Corp.)*, 872 F.2d 739, 743 (6th Cir.1989) (citation omitted); *J.P. Fyfe*, 96 B.R. at 476–77.

In comparing the preferential payments with payments made prior to the preference period, several factors are examined including "timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made." *Yurika Foods Corp. v. United Parcel Service (In re Yurika Foods Corp.)*, 888 F.2d 42, 45 (6th Cir.1989).

In the instant matter, Plaintiff argues that the subject payments do not fall under the protection of the ordinary course of business defense because (1) such payments differed substantially from previous payments in terms of the amount of time from invoice date until payment; and (2) the dollar amount of the payments significantly exceeded the dollar amount of payments during other time periods of the same duration.[14]

"Lateness is particularly relevant in determining whether payments should be protected by the ordinary course of business exception." *Marathon Oil Co. v. Flatau, (In re Craig Oil Co.)*, 785 F.2d 1563, 1567 (11th Cir.1986). *See also Grand Chevrolet*, 25 F.3d at 732; *Fred Hawes*, 957 F.2d at 244. However, this Court embraces those circuit court holdings which have rejected a *per se* rule that late payments can never be ordinary and have adopted the principle that late payments may fall within the ordinary course of business exception if the prior course of conduct between the parties demonstrates that those types of payments were ordinarily made. *See Grand Chevrolet*, 25 F.3d at 732; *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991); *Yurika Foods*, 888 F.2d at 44.

In order to establish its "baseline of dealings" with the Debtor, Venus offered the testimony of its Vice President, Stanley Chow, who testified to the payment history of the Debtor as reflected in Venus' books and records as well as to Venus' history of tolerance for long delays from invoice date to payment date.

Venus also offered into evidence a reconciliation form reflecting the Debtor's payment history for the year 1991 up the time of the Debtor's filing in 1992.[15] Shortly after the trial, this Court determined that inasmuch as the Debtor and Venus maintained a nine-year relationship, the 1991 reconciliation form submitted at trial did not adequately reflect the parties' business dealings during the course of nine years. *See Ellenberg v. Tulip Production Polymerics, Inc. (In re T.B. Home Sewing Enters. Inc.)*, 173 B.R. 782, 788 (Bankr.N.D.Ga.1993) *citing Iannacone v. Klement Sausage Co., Inc. (In re Hancock–Nelson Mercantile Co.)*, 122 B.R. 1006, 1013 (Bankr.D.Minn.1991) (noting that a "baseline of dealings" must be fixed during

---

strate some consistency with other business transactions between the debtor and the creditor."); *Child World, Inc. v. Service Merchandise Co. (In re Child World, Inc.)*, 173 B.R. 473, 478 n. 4 (Bankr.S.D.N.Y.1994) ("Since there is no definition of an ordinary course transaction, courts are left to conduct what amounts to a 'peculiarly' 'factual inquiry' into 'the business practices which were unique to particular parties under consideration.' *In re Jeffrey Bigelow Design*

*Group, Inc.*, 956 F.2d 479, 486 (4th Cir.1992) (citing *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 743 (6th Cir.1989) and *In re First Software Corp.*, 81 B.R. 211, 213 (Bankr.D.Mass.1988)).")

**14.** Plaintiff's Post–Trial Memorandum of Law, at 14.

**15.** Tr. at 36.

a time in which debtor's operations were "ordinary" in layman's sense of the word; this period should extend back into the time before debtor became distressed). Consequently, at the request of the Court, Venus submitted and the Plaintiff responded to an additional reconciliation form for the year 1990. These reconciliation forms listed the invoice date, invoice number, invoice amount, payment date and payment amount.

It is undisputed that each of the subject payments were made beyond the invoice terms of 14 days. Mr. Chow testified that the Debtor, as one of Venus' first customers, was always slow to pay and, apparently, as an old and valued customer, was extended a $100,000 credit line and liberal payment terms.[16] Mr. Chow testified that while Venus' customers generally paid within 60 to 90 days after invoicing,[17] the Debtor usually paid in 100 to 120 days.[18] He also testified that the Debtor would often pay invoices with multiple payments rather than in a single payment,[19] and further stated that on many occasions the Debtor's outstanding balance was more than $100,000.[20]

Moreover, the testimony at trial was that Venus' willingness to enter into prolonged payment terms with its customers was necessitated by the nature of its business, i.e., manufacturing and supplying of specialized Chinese food products in a highly competitive market. Mr. Chow explained that when Venus' inventory levels would run high, with a concurrent risk of product spoilage, Venus would extend payment terms to those customers who would accommodate Venus by purchasing greater than normal amounts of its products.[21]

In consideration of the testimony and the transactional history of the parties as set forth in Venus' reconciliation forms, it was clear that Venus established a baseline of dealings indicating significant and substantial delays in payments and a history of tolerance therefor. However, this Court's analysis must also include a determination of whether there was a material change in the timing or manner of the payments made during the preference period which would reflect a transition from ordinary to nonordinary.

The Court's analysis of the payment history during the pre-preference period shows that in 1990 the Debtor's payments to Venus ranged from 53 to 142 days with an average of 95 days after invoicing, and in the 1991–1992 period, payments ranged from 63 to 99 days with an average of 83 days after invoicing.[22] During the entire pre-preference period, the Debtor's payments averaged 89 days after the invoice date.

During the preference period, the Debtor made 4 payments which were 104, 110, 112 and 115 days after the invoice date for an average of 110 days after invoicing.

Although the average payment in the preference period was made later than the average payment during the pre-preference period, a comparison of the pre-preference and preference payments shows that in both periods there were substantial and significant

16. Tr. at 33–34, 47. According to the testimony, this $100,000 credit line had been maintained with the Debtor for the past four or five years.

17. Tr. at 33.

18. Tr. at 34.

19. Tr. at 47.

20. Venus' accounting ledger with the Debtor was entered into evidence as Exhibit B and supported Mr. Chow's observation with respect to the Debtor's outstanding balances.

21. Tr. at 54.

22. Venus calculated payment intervals by computing the number of days between the invoice date and the date of payment without considering whether or not a payment represented full or partial payment. On the other hand, Plaintiff calculated intervals by computing the number of days from invoice date to the date of full payment without considering any partial payments.

The Court used the following methods to calculate time periods: If an invoice was paid with a single payment, the time period was simply the number of days between the invoice date and the payment date. However, if an invoice was paid with more than one payment, a "weighted" average was used, i.e., the ratio of each individual payment to the invoice total was multiplied by the number of days from the invoice date to the payment date. A "weighted" time calculation takes into consideration the percentage of the debt paid by each individual payment and results in a more accurate representation as to the age of a specific invoice.

delays in payments. In fact, the Debtor's payments in 1990—two years before the Debtor filed bankruptcy and, presumably, before the Debtor became financially distressed—were even later than payments made in 1991–1992.

In the context of the circumstances existing between Venus and the Debtor as reflected by the testimony of Mr. Chow, and mindful of the fact that absolute consistency in actual or average payment dates is unrealistic and not required,[23] the Court finds that the fact that the preference payment average of 110 days after invoicing, which was 15 days later than the 1990 average pre-preference payments and 27 days later than the 1991–1992 average pre-preference payments, is not solely sufficient to show that the preference payments did not follow the ordinary course of business established by these parties.

The submitted payment history demonstrates a practice of substantially late payments ranging from 53 up to 142 days after invoicing. In light of this prior transactional history supported by the fact that no evidence was presented that Venus ever commenced legal proceedings or actually suspended trading with the Debtor because of payment delays during the parties' nine-year business relationship, the shift in the average number of days between invoice and payment does not warrant removal from the ordinary course of business exception particularly when the preference payments were made during the period in which Venus expected to receive payment from the Debtor, i.e., between 100–120 days after invoice.[24]

■ Plaintiff also alleges that the preference period payments of $65,178.37 during the six-week period beginning February 24, 1992 and ending April 6, 1992 exceeded the $46,384.24 average payment during prior six-

week time periods in 1991 and 1992 and, therefore, such payments are not typical of the parties' dealings.[25] However, the Court finds this type of analysis misleading. The fact that the business of food distribution runs in cycles would tend to suggest that a comparison of average payments extracted from a select time period may yield entirely inaccurate results. This is likely in the instant matter inasmuch as there were six-week periods in the pre-preference period in which the sum of payments exceeded and/or came close to $65,178.37.

■ As has been noted, not only was there no evidence presented to indicate that there was any unusual action by Venus to collect the debt, there was no evidence presented to show that Venus did anything to gain any advantages based upon the Debtor's deteriorating financial condition or that Venus even knew of such condition.[26] There was no change in the form of payment and there was no evidence indicating that the subject payments were made after the Debtor ceased business operations. Moreover, Venus submitted into evidence a bill of lading dated April 2, 1992 indicating a shipment of food products valued at $7,180.10 to the Debtor on that date. Based upon Venus' experience of receiving payment from the Debtor from 53 to 142 days after invoice, Venus clearly did not expect the Debtor to file bankruptcy in the following month.

Accordingly, this Court finds that the subject payments were made in accordance with the baseline of dealings established by the parties and, thus, were within the scope of "recurring, customary credit transactions" which the statute was designed to protect. This Court therefore concludes that Venus has carried its burden in establishing that the subject preference payments were made

23. *See Lovett,* 931 F.2d at 498; *J.P. Fyfe,* 96 B.R. at 476; *Julien Co.,* 157 B.R. at 841–41.

24. Tr. at 34.

25. Plaintiff's Post–Trial Memorandum of Law at 13–14.

26. *See Marathon Oil Co. v. Flatau (In re Craig Oil Co.),* 785 F.2d 1563, 1566 (11th Cir.1986)

("§ 547(c)(2) should protect those payments which do not result from 'unusual' debt collection or payment practices. To the extent an otherwise 'normal' payment occurs in response to such practices, it is without the scope of § 547(c)(2). Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts.").

in the ordinary course of business of the parties as required by section 547(c)(2)(B).

*Section 547(c)(2)(C)*

■ The Court next considers whether Venus has established that the subject payments were made according to ordinary business terms as required by section 547(c)(2)(C). The interpretation of this provision has generated a number of decisions concerning the appropriate benchmark to use in determining whether a preference payment's terms are "ordinary." Although the Second Circuit Court of Appeals has not addressed this issue, according to the majority of the circuit courts, section 547(c)(2)(C) requires objective proof that the subject payments were "ordinary" in relation to the prevailing standards in the creditor's industry.[27]

Thus, to the extent that section 547(c)(2)(C) requires a comparison with the norms of Venus' industry, i.e., manufacturing and supplying of Chinese food products, Mr. Chow testified that tolerance for late payments was not only Venus' normal practice with its other customers but was the normal practice in this industry.[28] The Plaintiff objected to the foregoing testimony as "self-serving" and "insufficient to establish the Chinese food industry norm and the [Debtor's] conformance therewith"[29] and although the Court sustained Plaintiff's objection, it gave Venus the opportunity to prove the industry norms by submitting affidavits after trial and suggested to Plaintiff that he could cross-examine the deponents in California at the expense of the estate.[30]

Venus thereafter submitted affidavits from three other manufacturers of Chinese food products, two of which were from other manufacturers/suppliers being sued by Plaintiff for alleged preferential transfers and one from a manufacturer not being sued by Plaintiff nor related to any party herein. These affidavits, consistent with Mr. Chow's testimony, indicated that delays in payment were the norm in this industry and that it was the practice of such manufacturers to permit a good customer to pay late in order to compete in this market and avoid losing the customer.

Indeed, Mr. Chow's testimony explained why manufacturers and suppliers of Chinese food products accepted late payments from their established customers, to wit, in this highly competitive business, customers would trade only with those manufacturers who afforded them liberal payment terms and, extended payment terms were provided for those customers who accommodated Venus by purchasing greater than normal levels of product when inventories ran high.[31]

Without offering any evidence to the contrary, Plaintiff objected to the aforesaid affidavits as insufficient to prove "ordinary business terms" and as self-serving with respect to the two manufacturers/suppliers who are also being sued in this case.

■ However, this Court notes that self-serving testimony may suffice to prove what "ordinary business terms" are for a particular industry when there is no evidence to the contrary,[32] and endorses the Seventh

---

27. See *Advo–System Inc. v. Maxway Corp.*, 37 F.3d 1044, 1048 (4th Dept.1994); *Sulmeyer v. Suzuki* (*In re Grand Chevrolet, Inc.*), 25 F.3d 728, 733 (9th Cir.1994); *Fiber Lite Corp. v. Molded Acoustical Prod., Inc.* (*In re Molded Acoustical Prod., Inc.*), 18 F.3d 217, 223 (3d Cir.1994); *Clark v. Balcor Real Estate Finance, Inc.* (*In re Meridith Hoffman Partners*), 12 F.3d 1549, 1553 (10th Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994); *Jones v. United Sav. & Loan Ass'n* (*In re U.S.A. Inns of Eureka Springs, Ark.*), 9 F.3d 680, 683–84 (8th Cir.1993); *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032–33 (7th Cir.1993); *Logan v. Basic Distrib. Corp.* (*In re Fred Hawes Org.*), 957 F.2d 239, 243–44 (6th Cir.1992); *Compare Marathon Oil Co. v. Flatau* (*In re Craig Oil Co.*), 785 F.2d 1563, 1566–67 (11th Cir.1986) (applying the same subjective analysis for both subsections (B)

and (C) and, therefore, not requiring proof of ordinary business terms.)

28. Tr. at 51–55.

29. Plaintiff's Post–Trial Memorandum of Law, at 22.

30. Tr. at 76.

31. Tr. at 54.

32. See *Wallach v. Vulcan Steam Forging Co., Inc.* (*In re D.J. Management Group*), 164 B.R. 831, 836 (Bankr.W.D.N.Y.1991); *Morris v. Kansas Drywall Supply Co.* (*In re Classic Drywall, Inc.*), 121 B.R. 69 (D.Kan.1990); *Jones v. United Sav. and Loan Ass'n* (*In re U.S.A. Inns of Eureka*

Circuit's conclusion in *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032–33 (7th Cir.1993) that "ordinary business terms" means "the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." *Id.*

Indeed, in *Jones v. United Savings & Loan Association (In re U.S.A. Inns of Eureka Springs Arkansas, Inc.)*, 9 F.3d 680, 685 (8th Cir.1993) the Eighth Circuit, in adopting the *Tolona Pizza* formulation, held that section 547(c)(2)(C) does not require a creditor to establish the existence of a uniform set of business terms in a particular industry but rather requires "evidence of a prevailing practice among similarly situated members of the industry facing the same or similar problems." *Id.* In that case, the Eighth Circuit held that evidence of a regular practice in the savings and loan industry of working with *delinquent* customers on special terms sufficiently satisfied subsection (C).

More recently, the Third Circuit in *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 225–27 (3d Cir.1994) permitted greater departure from the range of normal industry standards based upon the duration of the pre-insolvency relationship between the debtor and creditor but unlike the Eighth Circuit in *U.S.A. Inns,* rejected the contention that ordinary business terms encompass the ordinary practices used when dealing with abnormal financial relationships.[33]

■ In applying the foregoing principles to the facts herein, this Court concludes that the parties endured a steady nine year relationship during which Venus confidently and consistently gave the Debtor liberal exten-

sions of credit. No evidence was presented to deem Venus' relationship with the Debtor as "abnormal." In the context of all of the facts and circumstances, the Court finds that Venus did not alter its normal collection practices, initiate or threaten legal action or exhibit any unusual behavior designed to improve its position over other creditors.

In light of all of the foregoing, this Court finds that the post-trial affidavits as well as the testimony offered at trial sufficiently established that it was the ordinary practice for manufacturers and suppliers of Chinese food products to permit late payments from regular, long-term customers and that Venus has demonstrated conformity with that practice.

Accordingly, the Court finds that Venus has satisfied the objective requirement under section 547(c)(2)(C) and that the payments by the Debtor were made according to a long-standing practice between these parties.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter of this proceeding under 28 U.S.C. § 1334 and § 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(F).

2. Plaintiff has established that the following transfers aggregating $65,178.37 made by Defendant, Venus Foods, Inc. to the Debtor are preferences pursuant to 11 U.S.C. § 547(b):

| Date | Check No. | Amount |
|---|---|---|
| February 24, 1992 | 8151 | $10,000.00 |
| February 29, 1992 | 8152 | 10,000.00 |
| March 9, 1992 | 8153 | 10,000.00 |
| March 16, 1992 | 8154 | 8,884.75 |
| March 23, 1992 | 8155 | 6,925.10 |
| March 27, 1992 | 8247 | 9,368.52 |
| April 6, 1992 | 8248 | 10,000.00 |
| | Total | $65,178.37 |

3. The parties have agreed that Defendant, Venus Foods, Inc. has established that the Debtor received new value in the amount of $37,474.10 for payments made during the preference period and that pursuant to sec-

---

Springs Arkansas, Inc.). 9 F.3d 680 (8th Cir. 1993). *Cf. Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 247 (6th Cir.1992) (company president's self-serving testimony insufficient alone to prove industry standards).

33. *See Clark v. Balcor Real Estate Fin. Inc. (In re Meridith Hoffman Partners )*, 12 F.3d 1549, 1552 (10th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994) (Tenth Circuit rejected the conclusion that ordinary business terms can exist in an abnormal relationship.)

tion 547(c)(4) such amount is insulated from avoidance.

4. Defendant, Venus Foods, Inc. has established that the remaining $27,704.27 in preferential payments are excepted from avoidance pursuant to 11 U.S.C. § 547(c)(2) and, as a matter of law, may not be recovered.

SETTLE AN ORDER IN CONFORMITY WITH THESE FINDINGS OF FACTS AND CONCLUSIONS OF LAW.