**In re RAVE COMMUNICATIONS, INC., Debtor.**

**Lynn P. HARRISON III, as Trustee for the Estate of RAVE COMMUNICATIONS, INC., Plaintiff,**

v.

**The INK SPOT, Defendant.**

Bankruptcy No. 88–B–11936.

Adv. No. 89–5501A.

United States Bankruptcy Court, S.D. New York.

June 24, 1991.

Curtis, Mallet–Prevost, Colt & Mosle by Gary M. Feuerman, Lynn P. Harrison III, New York City, for Chapter 7 Trustee.

Barr & Rosenbaum by Harvey S. Barr, Spring Valley, N.Y., for defendant.

RESERVE DECISION ON INK SPOT'S DEFENSES OF "ORDINARY COURSE OF BUSINESS" AND "NEW VALUE" UNDER § 547(c)(2) and (4)

CORNELIUS BLACKSHEAR,
Bankruptcy Judge.

*Introduction*

On September 8, 1988, petitioning creditors filed an involuntary petition ("peti-

tion") against Rave Communications, Inc. ("Rave" or "Debtor") for chapter 7 liquidation pursuant to Title 11 of the United States Code ("Code"). Thereafter, Lynn P. Harrison III was appointed Interim Trustee on October 13, 1988, and became the permanent Trustee by operation of law on March 22, 1989.

In the 90 days preceding Rave's involuntary bankruptcy petition, The Ink Spot, Inc. ("Ink Spot") received five checks from Rave as follows: (1) $45,000 on June 22, (2) $45,000 on July 1, (3) $10,994 on August 16, (4) $73,132 on August 19, and (5) $46,205.58 on September 2. These checks were in response to 26 invoices dispatched to Rave between March 31, 1988, and August 31, 1988. All of the checks were paid except the last.

On March 15, 1989, Mr. Harrison filed the complaint commencing this adversary proceeding. The original complaint alleged the existence of two preferential transfers from Rave to Ink Spot ("(3)" and "(4)" above) and prayed for monetary relief of $77,376.[1] In a bench ruling on February 22, 1991, this Court held that the Trustee made a prima facie showing that the transfers made from Rave to Ink Spot were preferential according to § 547(b) of the Code. Additionally, the Trustee was granted leave to amend the complaint to add two transfers not included in the original complaint but discussed at the trial.[2] However, this Court reserved decision on Ink Spot's defenses: (1) the ordinary course of business exception under § 547(c)(2), and (2) the new value exception under § 547(c)(4).

### Arguments

Ink Spot urges that the payments it received from Rave were made in the ordinary course of business, that the payments were received without any knowledge of insolvency, and that no extraordinary collection methods were used. Ink Spot further argues that, in certain instances, to the extent the payments appear to have

been made outside the ordinary course of business, new value was given.

Conversely, Rave argues that the payments were not made in the ordinary course of business because the average collection period far exceeded the stated invoice terms of "net 30 days." Rave further argues that to the extent that any new value was given, it has already been deducted from the preference amount.

### Facts

In February 1988, Ink Spot and Rave entered into an agreement whereby Ink Spot would print six separate 48 page concert programs for Rave. Ink Spot would initially print 32 of the 48 pages of the programs and invoice Rave for the amount of work done up to that point. As the respective concert dates were definitively set, Ink Spot would print the remaining 16 pages which included material specific to each concert location as well as local advertising. Once the updates were printed, they were inserted into the programs that were being held in Ink Spot's plant and shipped to the respective concert locations. At this point, Rave would be invoiced for the completion portion of the project. Ink Spot's invoices stated collection terms as "net 30 days."

The checks received by Ink Spot on June 22 and July 1 in the amount of $45,000 each were paid in accordance with an order placed by Rave for a large number of programs slated for May delivery. These two checks were not challenged as preferential transfers in the original complaint because they appeared to be paid within 22, 14 and 5 days of the invoices to which they corresponded, which was well within the terms of "net 30 days." However, at trial, it came to light that the invoices had been reissued. Specifically, it was explained that, after the order was placed, the Debtor notified Ink Spot that it could not take delivery of the programs until "mid-to-late June." At this point, Ink Spot had already

1. This amount is net of new value.

2. Accordingly, the First Amended Complaint, filed post-trial on April 9, 1991, seeks to recover

a total of four transfers, net of new value received, totalling $167,376.

ordered and received the paper for the programs and, since it was not its practice to warehouse paper for customers, Ink Spot informed Rave that it would either sell the paper or Rave could pay for it at that time.[3] Rave agreed to pay for the paper and Ink Spot issued a corresponding invoice on April 29.

When these programs were completed, Rave had not yet paid for the paper, and, thus, to avoid double-billing, Ink Spot modified the existing paper invoices and reissued them to reflect the finished product. The reissued invoices were dated on May 31, 1988 and June 17, 1988, and were paid on June 22 and July 1, respectively. The payments clearly were made within 30 days of the "finished product" invoices; however, plaintiff argued that since the paper was invoiced on April 29, the portion of the subsequent paid invoice that relates to the paper was paid outside the ordinary course of business because it was paid 50 or more days after the original invoices.

The two other checks which are the subject of this preference action, and which were listed in the original complaint, were paid on August 25. Each of these checks related to several invoices which were issued anywhere from 55 days to 146 days before payment. A specific explanation of the genesis of the dozen or so invoices to which these two checks were applied, as was given with regard to the two $45,000 checks previously discussed, was not provided in the memoranda or at trial. Rather, the Trustee simply pointed to the stated terms of "net 30 days," while the defendant focused on the average span of the collection period for its ordinary course of business defense.

Although the invoices used by Ink Spot in its collections had stated terms of "net 30 days," the evidence at trial demonstrated that the actual average turnaround for payment from Rave was quite different. For instance, Allan James, the owner/president of Ink Spot, testified in response to

various questions that Ink Spot's collections from Rave and other customers ranged in the "80," "75," "60–80," "75–80" and "60" day range. *Tr.* pp. 33, 34, 46, 49, 57. In addition, Anthony Trezza, a former employee of Rave, testified that Rave made payment, and/or it was customary in the industry for payment to be made, in the "60–80," "45–60," "60," "45–120" day range. *Tr.* pp. 67–73.

### Discussion

The first step in this process is to look at the language of the statute itself. Under 11 U.S.C. § 547(b), a bankruptcy trustee may avoid the transfer to a creditor of an interest in property of the debtor that is made (1) on or within 90 days before the date of the filing of the petition, (2) while the debtor is insolvent, (3) on account of an antecedent debt, and (4) which enables the creditor to receive more than it would receive under a bankruptcy liquidation. The payments made by Rave to Ink Spot during the 90 days preceding the filing of the petition meet these requirements and thus prima facie constitute a preference.

■ However, section 547(c)(2) of the Code provides that the trustee may not avoid under subsection (b) a transfer to the extent that such transfer was:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business of the debtor's business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

The exception is intended to protect ordinary trade creditor transactions. According to the legislative history, "the purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the

---

**3.** At trial, Allan James, the owner/president of Ink Spot testified that the standard practice in the printing industry is that either the customer provides the paper to the printer or the printer

purchases the paper and bills the customer for the cost of the paper upon receipt of the paper by the printer. *Tr.* pp. 54–55.

preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), S.R. No. 989, 95th Cong., 2d Sess. 88 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News, 5787, 5874, 6329. Otherwise, trade creditors, such as Ink Spot, might cease ordinary trade with any customer who appeared to be experiencing financial difficulty, thus hastening its slide into bankruptcy. *See J.P. Fyfe, Inc. v. Bradco Supply Corp. (In re J.P. Fyfe, Inc.)*, 96 B.R. 474, 477 (D.N.J.1988), *aff'd*, 891 F.2d 66 (3d Cir.1989).

There is little case law discussion of what exactly constitutes a transaction in "the ordinary course of business." *In re Fulghum Constr. Corp.*, 872 F.2d 739, 743 (6th Cir.1989). According to the Sixth Circuit Court of Appeals, the court must engage in a factual analysis of the business practices between the debtor and creditor. *In re Yurika Foods Corp.*, 888 F.2d 42, 45 (6th Cir.1989); *accord In re Jet Florida Systems, Inc.*, 861 F.2d 1555 (11th Cir.1988) (What is "ordinary" as between a particular debtor and creditor is essentially a question of fact.). A factual analysis should consider the following: (1) the prior course of dealing between the parties, (2) the amount of the payments, (3) the timing of the payment, and (4) the circumstances surrounding the payments. *See generally Yurika*, 888 F.2d at 45 (citing *In re White*, 58 B.R. 266 (Bankr.E.D.Tenn.1986).

■ Clearly, the requirement of subsection (c)(2)(A) is met, since the debts were incurred by Rave in the ordinary course of its business with Ink Spot. The real questions of import here are whether the payments were made according to ordinary business terms and in the ordinary course of business.

Rave contends that the payments do not come within the sanctuary of the ordinary course of business defense for several reasons. First, since the collections were made outside the stated invoice terms of "net 30 days," they were not made according to ordinary business terms. Section 547(c)(2)(C). Rave buttresses this argument with two letters written by Allan James to William Kosovich of Rave in which he reminds Rave that the terms are "net 30 days" and requests that Rave bring any outstanding payables current. *See* Exhs. 5B and 5c.

However, the prior course of dealing between Rave and Ink Spot illustrates that the average collection time on receivables was substantially more than 30 days. Exhibit 5-A provides a comparison of 10 payments made and the age of the invoices to which they correspond from November 1987 until September 1988. Only one of the invoices were paid within 30 days of issuance and most were paid between 50 and 70 days or longer.[4] Since the six projects that Ink Spot was working on for Rave were continuous, Ink Spot invoiced Rave for portions of that work and related costs as they were incurred. As Rave made payment, Ink Spot would simply credit the payment to the oldest invoices first. Again, to avoid double billing, invoices were sometimes reissued when payment was not made on a "portion-invoice" or in full.

■ Thus, although the payments may have been late, this was the normal course of business practice between the parties. Late payment in conformity with the prior course of dealing is in the ordinary course of business. *Yurika*, 888 F.2d at 45; *see also In re White*, 64 B.R. 843 (Bankr.E.D. Tenn.1986). Further, to the extent that subsection (c)(2)(C) requires any comparison with the industry, testimony indicated that late payment was not only the usual practice between the parties, but was the

---

**4.** Of the 22 invoices listed in Exhibit 5–A, collections times were as follows:

| AGE OF INVOICE | NUMBER OF INVOICES COLLECTED |
| --- | --- |
| 30 days or less | 1 |
| 30–50 days | 5 |
| 50–70 days | 12* |
| 70 days or more | 4 |

* Invoice number 7018601 was listed as collected in 57 days, however the "01" at the end of the invoice number indicates that it was reissued. Therefore, it may have been collected in 50–70 or 70 or more days; however, the record is unclear as to which time frame is correct.

normal practice of Ink Spot with its other customers, as well as the norm of the industry. *Tr.* p. 67. This testimony was not refuted.

Second, Rave contends that the last payment of $73,132 was unusually high; indicating two problems in Ink Spot's ordinary course defense—one, Ink Spot's awareness of Rave's precarious financial condition, and two, the use of an extraordinary collection method via the alteration of normal billing and credit terms. The payment of $73,132 was undoubtedly higher than the previous three payments, which ranged between $10,994 and $45,000, but it was not so disproportionate as to imply an unusual transaction. In fact, Ink Spot continued to print updates for the programs and ship them through the beginning of September, 1988. At trial, Allan James testified that he did not have any reason to believe that Rave was insolvent until the September 2 check was returned for insufficient funds. Evidently, when Ink Spot received the previous four checks it was not aware of Rave's financial difficulty. Thus, it did not have any reason, nor did it take any extraordinary actions, to force Rave into making an unusually high payment. These factors demonstrate that nothing unusual was occurring and that the parties planned to continue their normal course of business.

However, Rave also relies on the letters from James reminding Rave of the 30 day term and also the tacit threat not to deliver other goods until payment was made. According to Rave, the substance of the letters is evidence of extraordinary collection methods which are clearly outside the ordinary course of business. Nonetheless, the letters do not undermine this Court's ultimate conclusion that late payments are consistent with those "made according to ordinary business terms." It does not seem unusual for a creditor to employ the "carrot and stick" to urge its customer to pay more promptly. Thus, subsection (c)(2)(B) is satisfied.

*Conclusion*

■ The Court has considered the prior course of dealing between Rave and Ink Spot, the amounts and timing of the payments, and the circumstances surrounding the payments. To this Court, the "ordinary course of business" between these parties is defined by the way the parties actually conducted their business, not by the terms stated in the invoices or in collection letters. Rave required the services of Ink Spot to continue its regular business of promoting concerts. In pursuit of that end, Rave made payment to Ink Spot, although history shows that such payments were made significantly later than as provided in the stated terms. However, Ink Spot did not engage in any extraordinary action to obtain payment. In sum, the facts of the transaction suggest that Ink Spot was an ordinary trade creditor of Rave and the payments were made in accordance with the prior course of dealing between the parties. Such a finding appears in accord with what Congress envisioned when they promulgated the exception.

Accordingly, recovery of the transfers is denied.[5]

Attorneys for Defendant to settle an Order consistent with this decision.

---

5. In view of the conclusion drawn by the Court on the "ordinary course of business" defense, it is unnecessary to reach Ink Spot's alternative defense of "new value" under § 547(c)(4).