In re **BERGER INDUSTRIES, INC.,** Debtor.

**Berger Industries, Inc., Plaintiff,**

**v.**

**Artmark Products Corp., Defendant.**

**Bankruptcy No. 193–19648–353. Adversary No. 195–1632–353.**

United States Bankruptcy Court, E.D. New York.

April 12, 2001.

Angel & Frankel, P.C., New York City, by Neil Y. Siegel, for debtor.

Brown & Fox, P.C., New York City, by Rodney A. Brown, Cori Sherman Thune, for defendant.

*DECISION ON PREFERENCE ACTION*

JEROME FELLER, Bankruptcy Judge.

### INTRODUCTION

Berger Industries, Inc., the Chapter 11 debtor herein ("Berger or the Debtor") initiated this adversary proceeding by the filing of a complaint, dated November 13, 1995, to recover alleged preferential transfers pursuant to Section 547(b) of the Bankruptcy Code.[1] According to the complaint, payments in the aggregate amount of $177,631.36 were made by the Debtor to the defendant, Artmark Products Corp. ("Artmark" or the "Defendant") within ninety days preceding commencement of the Debtor's involuntary bankruptcy case and that these payments were preferential.[2]

In its answer and amended answer, Artmark disputed the allegation that the subject payments were preferences and further contended that even if they were, such transfers were protected from avoidance and recovery under the ordinary course of business exception of Section 547(c)(2) and the new value exception of Section 547(c)(1) and (c)(4).

This matter having come on for trial and after consideration of the arguments of counsel, the evidence presented, stipulations of fact, and post-trial submissions, this Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52[3] made applicable to this proceeding by Rule 7052.

---

1. Unless otherwise indicated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

2. An involuntary bankruptcy petition was filed against Berger by several steel suppliers on November 16, 1993. On November 18, 1993, the Court granted Berger's motion to convert the Chapter 7 case to one under Chapter 11.

3. Fed.R.Civ.P. 52 provides, in pertinent part, that "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon...."

## FINDINGS OF FACT

1. Berger was a manufacturer of electrical couplings and connectors, steel tubing and conduits.[4]

2. Artmark is an importer of industrial components. (Tr. D2 at 46).

3. Artmark was one of Berger's major suppliers. (Tr. D1 at 6, 127).

4. Artmark imported proprietary products for Berger. (Tr. D2 at 46). These products were manufactured in accordance with Berger's blueprint specifications. (*Id.*; Tr. D1 at 125–126). Artmark imported various types of castings, primarily metal and alloy castings, some stamping, plastic components and fastener screws. (Tr. D2 at 46; Tr. D1 at 125–126).

5. Artmark was not the only supplier of these parts for Berger. In fact, Berger provided blueprints to other domestic manufacturers. (*Id.* at 126). Mr. Steven Glusky ("Glusky"), Berger's former Director of Purchasing (*Id.* at 115), testified that Tri–State became a secondary supplier to Berger in August 1993. (*Id.* at 133–134).

6. Berger was an old and valued customer of Artmark (Tr. D2 at 63), and they had maintained a business relationship since the early 1980's. (*Id.* at 47).

7. Prior to Berger's bankruptcy filing, Artmark always accepted payment by check. (*Id.* at 53). Throughout the course of its dealings with Artmark, Berger would often pay invoices with multiple payments rather than in a single payment. (Tr. D1 at 128; Plaintiff's Exhibit 1).[5] Moreover, Berger would often use a single check to pay multiple invoices. (Tr. D1 at 129; Pl.Ex. 1).

8. Historically, Berger paid Artmark late. (Tr. D2 at 63; Pl.Exs. 1 & 3; Def. Ex. L). In his sworn deposition testimony, dated December 2, 1998, Mr. Frank Lifman ("Lifman"), who was Berger's Chief Financial Officer, confirmed that Berger was late in paying Artmark and other creditors in the period August 1992 to August 1993. (Def.Ex. P at 39, 41). Glusky also testified that the Debtor was a late payer and never paid Artmark according to the net 30 invoice term. (Tr. D1 at 127).

9. Plaintiff's Exhibit 1 shows that throughout 1992 and 1993, Berger never paid within 30 days of the invoice (Pl.Ex.1), and that Berger rarely paid even within 60 days of the invoice. (Pl.Ex. 1; *see* Def.Ex. L). Defendant's Exhibit L demonstrates that the payments received by Artmark from Berger remained fairly steady up until October 1, 1993. (Def.Ex. L; Tr. D2 at 56).[6] Significantly, the third column, entitled "Sales Invoiced," in Defendant's Exhibit L shows a decline in product purchased by Berger from Artmark. (Def.Ex. L; Tr. D2 at 57). Mr. Frank Kiernan ("Kiernan"), the President and 100% shareholder of Artmark since 1990 (*Id.* at 45), testified that this was his understand-

---

**4.** July 21, 1999 Transcript, p. 21. The trial was conducted on July 21, 1999, and July 29, 1999. Hereinafter, all references to the trial transcript of July 21, 1999 will be designated "Tr. D1" and proceedings on July 29, 1999 will be designated "Tr. D2."

**5.** The Exhibits introduced at trial by Berger are referred to as "Pl.Ex." and the Exhibits introduced at trial by Artmark are designated as "Def.Ex."

**6.** Defendant's Exhibit L contains an analysis of Berger's payments to Artmark on a quarterly basis. (Def.Ex. L; Tr. D2 at 56). The second column is entitled "Cash Received On Invoices" and shows that the last figure is only for one month and 12 days into November and therefore, does not represent a full quarter. (*Id.*).

ing as to why the accounts receivable declined. (*Id.* at 57).

10. Artmark tolerated the late payments from Berger because Berger was a long-standing and good customer of Artmark for more than ten years. (*Id.* at 63).

11. Kiernan further testified that during the period of time that Artmark and Berger conducted business, other companies, including The William Powell Company, Watts Regulator, and WASCO Hardfacing, paid Artmark late. (*Id.* at 64–65). Artmark tolerated these late payments because they also were and are good customers. (*Id.* at 64). Another reason given for Artmark's toleration of late payments is that Artmark has both international and national competitors who commonly accept delinquent payments. (Tr. D2 at 64–65, 67). As Kiernan testified, "Delinquent payments are so standard today that computerized forms show current, zero to 30 days late, 31 to 60 days late, 60 to 90 days late. That is how common practice it is when form manufacturers have standardized forms showing delinquent payments." (*Id.* at 67). Finally, Kiernan testified that he has learned in the past 25 years from his customers that his competitors tolerate slow payments and that his customers use this information when negotiating terms with Artmark. (*Id.*).

12. Mr. Dennis Willhoite ("Willhoite"), Artmark's Vice President for sales and marketing since 1998, testified concerning the practice of tolerating late payments in the industrial components industry. (Tr. D2 at 95–103). Willhoite was previously employed by The William Powell Company and had been with that company for 35 years. (*Id.* at 96). From 1982 until 1998, Willhoite was Vice President of purchasing at The William Powell Company, a company that manufactures industrial valves. (*Id.*). Willhoite testified that The William Powell Company and Berger were similar to the extent that The William Powell Company sent drawings to suppliers who would furnish the parts. (*Id.* at 104). Artmark was a supplier of The William Powell Company. (*Id.* at 107–108).

13. Willhoite testified that The William Powell Company was a slow payer of Artmark. (*Id.* at 96). Willhoite identified Simmons International, Custom Castings and Artmark as the three suppliers who provided imported parts to The William Powell Company. (*Id.* at 97). Willhoite further testified that The William Powell Company was a slow payer of these other companies as well. (*Id.*). The practice was tolerated because The William Powell Company was a good company and it was standard practice that it would pay slow. (*Id.*).

14. With respect to his employment at Artmark, Willhoite testified that the accounts' which he deals with are slow paying. (*Id.* at 98). Artmark tolerates slow payment because there is good business potential and it is simply standard business practice. (*Id.*).

15. Berger did not refute Kiernan and Willhoite's testimony concerning the fact that the norm of the industry was to accept late payments.

16. Berger did not proffer any testimony or evidence that it was not a slow payer or that the standard in its business was to pay on time.

17. Prior to the filing of the involuntary petition against Berger, Artmark never sent any demand letters for payment or "dunning" or collection type letters demanding payment. (*Id.* at 69). Artmark never threatened, nor commenced litigation against Berger. (*Id.* at 69–70). Artmark never demanded COD payments, add on payments or accelerated payments from Berger. (*Id.*). Kiernan testified that prior to the involuntary filing against Ber-

ger, Artmark never cancelled any of Berger's orders (*Id.* at 57), and never threatened to suspend trading with Berger in order to elicit payment. (*Id.* at 55–57). Moreover, Glusky, a witness called on behalf of Berger, confirmed Kiernan's testimony insofar as there were no COD payments to Artmark prior to November 16, 1993 (Tr. D1 at 133, 148), and that he did not recall Berger receiving any demand letters from Artmark. (*Id.* at 132). Glusky also testified that Artmark never placed a credit limit on Berger (*Id.* at 131) and that Artmark made no effort to raise its prices on Berger based on the amount of indebtedness that existed. (*Id.* at 131–132).

18. Glusky testified that some time in the middle of 1993, Mr. Allan Meltzer ("Meltzer"), who was employed by Artmark as an import sales manager,[7] began asking Glusky if Berger could make payments to Artmark for invoices that Artmark thought were past due. (*Id.* at 119–120). Glusky explained that Berger had fallen further behind than was customary and Artmark wanted Berger to bring its accounts payable closer to a customary time frame. (*Id.* at 121). Glusky further testified that Meltzer's requests for payment became more prevalent towards the end of 1993. (*Id.* at 120). However, Glusky also testified that prior to 1993, Artmark requested to be paid for product that it shipped to Berger. (*Id.* at 125). Glusky also stated that suppliers of Berger "absolutely" routinely requested to be paid and that he did not at all consider that to be an extraordinary event. (*Id.* at 142).

19. In response to an inquiry as to whether "Artmark resorted to a certain game plan to effectuate collections on delinquent accounts," Meltzer testified that he could not "remember any particular game plan." (Tr. D2 at 37).

20. There is no evidence, explicit or implicit, of any oral or written threat that Artmark would stop shipping to Berger unless it received payment. In fact, Kiernan testified that shortly before the filing against Berger, Berger sent two checks to Artmark that were deposited in Artmark's bank and subsequently returned by Artmark's bank as unpaid. (*Id.* at 54–55). Artmark's response to the bounced checks was simply to telephone Berger and obtain replacement checks. (*Id.* at 55). Artmark did not take any other action; it did not stop any shipment or cancel any orders. (*Id.*).

21. Berger never advised Artmark that Berger was having financial troubles during the period 1991 through the first couple of weeks of November 1993. (Tr. D1 at 68–69). Mr. Matt Harrison ("Harrison"), Berger's Chief Operating Officer, had no recollection of any communications whatsoever with any representative of Artmark regarding Berger's financial trouble prior to a post-petition creditors' meeting. (*Id.* at 70).

22. Artmark first learned of the involuntary bankruptcy in the latter part of November 1993. (Tr. D2 at 57). Artmark attended a creditors' meeting where it was suggested that the creditors cooperate with Berger because Berger hoped to reorganize. (*Id.* at 58).

23. On or about November 19, 1993, Berger advised Artmark of new payment terms and Artmark summarized the terms in a two page memo to Berger. (Def.Ex.H). This change in payment terms was originated by Berger. (Tr. D2 at 59). The memo also showed that Berger was continuing to order product from Artmark. (Def.Ex. H; Tr. D2 at 60). On November 22, 1993, Artmark sent Berger

7. Meltzer left Artmark's employment in December 1994.

another memo which reiterated Berger's intention to stay in business. (Def.Ex. 1; Tr. D2 at 61–62). Even after the bankruptcy filing, Artmark continued to do business with Berger through the first quarter of 1994. (*Id.* at 62).

24. Initially, in its complaint, Berger claimed preferential payments in the sum of $177,631.36 against Artmark. (Tr. D1 at 8). However, on January 20, 1997, Berger, in a letter, reduced its claim to $77,000, stating that "Berger believes there remains approximately $77,000 in transfers which were not subject to a new value or ordinary course of business defense." (Def.Ex. B; Tr. D1 at 81, 83).

25. On July 15, 1998, Berger's counsel sent to Artmark's counsel an Affidavit of Glusky, sworn to July 10, 1998, which decreased the claimed preference amount to $60,735. (Def.Ex.K).

26. On July 21, 1999, at the trial, Berger's counsel stated to the Court that "the bottom line recovery" sought by Berger is $55,029.37. (Tr. D1 at 8).

## DISCUSSION

■ In order to qualify as a preference, a transfer of an interest of the debtor in property must meet all the elements set forth in Section 547(b); *i.e.,* the transfer must have been

(1) to or for the benefit of [a] creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) on or within 90 days before the date of the filing of the petition (providing that the transferee is not an insider); and

(5) enables the benefitted creditor to receive more than such creditor would receive had the case been a Chapter 7 liquidation and the creditor not received the transfer.

*See* 11 U.S.C. § 547(b).

In this litigation, while Artmark raised the question as to whether Berger proved all of the aforementioned elements of a preferential transfer, clearly the focus and in fact, the central issue tried in the course of the two-day trial was whether the transfers in question are unavoidable and shielded pursuant to the ordinary course of business defense as codified in Section 547(c)(2).[8] Consequently, what this court needs to address is whether Artmark sustained its burden in proving this defense.

■ Section 547(c)(2) provides that a preferential transfer may not be avoided to the extent that such transfer was

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2). The purpose of Section 547(c)(2) is "to protect recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee." 5 *Collier on Bankruptcy* ¶ 547.04[2] at 547–47 (15th ed. rev.1996). It is also intended to encourage "normal financial relations, because [doing so] does not detract from the general policy of the preference section [which is] to discourage unusual action by either the debtor or his creditors during the debtor's slide into

---

**8.** In fact, the only issue addressed in Berger and Artmark's post-trial submissions is the applicability of the ordinary course of business defense.

bankruptcy." *Id.* at 547–48 (*quoting* H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), U.S.Code Cong. & Admin.News 1978, p. 5963). Section 547(c)(2) places the burden on the creditor to prove all three elements by a preponderance of the evidence. *Lawson v Ford Motor Co. (In re Roblin Industries, Inc.),* 78 F.3d 30, 39 (2nd Cir.1996); *Corporate Food Mgmt., Inc. v. Suffolk Community College (In re Corporate Food Mgmt.),* 223 B.R. 635, 641 (Bankr.E.D.N.Y.1998).

In this lawsuit, the first element is not in dispute. Consequently, the issues to be resolved are whether the payments were made in the ordinary course of the parties' relationship pursuant to Section 547(c)(2)(B), and according to ordinary business terms under Section 547(c)(2)(C).

■ With respect to the second element, a "subjective inquiry is made as to whether the payment of a debt was made in the ordinary course of business of the debtor and the transferee." *McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.),* 185 B.R. 103, 110 (Bankr.E.D.N.Y. 1995). The court in *Lan Yik* noted that in making this inquiry it is necessary to "look at the prior course of conduct" which existed between the parties. *Id.*

■ Courts consider numerous factors in comparing payments made during the preference period with those made during the non-preference period. Such factors include (1) the timing of the payments; (2) the amount of the payments; (3) the manner of payments; (4) whether the creditor or debtor engaged in any unusual collection or payment activity; and (5) the circumstances under which the transfer was made. *Tomlins v. BRW Paper Co., Inc. (In re Tulsa Litho Co.),* 229 B.R. 806, 809 (10th Cir. BAP 1999); *Lan Yik, supra,* at 111.

■ With respect to the timing of the payments, the Eastern District of New York has "rejected a *per se* rule that late payments can never be ordinary and have adopted the principle that late payments may fall within the ordinary course of business exception if the prior course of conduct between the parties demonstrates that those types of payments were ordinarily made." *Id.*

Artmark has clearly established that it tolerated long delays between the invoice date and payment. (Pl.Ex.3). Kiernan expressly testified that during their relationship spanning from the early 1980's through the end of 1993 (Tr. D2 at 47), Berger was historically a slow payer (*Id.* at 63) and that Berger was an old and valued customer of Artmark. (*Id.* at 63–64). The court found Kiernan to be a credible witness; his testimony was straightforward and non-evasive.

Berger contends, on the other hand, that the payments made during the preference period were outside the ordinary course of the parties' relationship. To support its position, Berger relies on a chart, Plaintiff's Exhibit 3, which illustrates that its indebtedness to Artmark decreased from approximately $254,508 in May 1993 to $110,999 on the date of the bankruptcy filing. (Pl.Ex. 3; Berger's Proposed Findings of Fact, Conclusions of Law, and Memorandum ("Berger's Memorandum" at 12)). While Berger seeks to establish that these numbers reflect a course of business that was less than ordinary, this chart, without more evidence, merely indicates a progressive decline in the amount of product being ordered by Berger and Berger's continued efforts to pay down its pre-established, past-due balance. Indeed, Defendant's Exhibit L highlights the steady drop in Artmark's sales to Berger

throughout the course of 1993. (Def.Ex. L; Tr. D2 at 57).[9]

Another factor that courts have considered in determining whether the payments in dispute were made in the ordinary course of business is whether the defendant ever instituted any legal proceedings or actually suspended trading because of payment delays, *i.e.,* pressure tactics. *See, e.g., Lan Yik, supra,* at 112; *In re Rave Communications, Inc. v. The Ink Spot (In re Rave Communications, Inc.),* 128 B.R. 369, 373 (Bankr.S.D.N.Y.1991). The record is devoid of any evidence that Artmark ever threatened litigation or commenced any litigation against Berger. (Tr. D2 at 69–70). Kiernan testified that prior to the involuntary petition being filed against Berger, Artmark never cancelled any of Berger's orders nor did Artmark ever threaten to suspend trading with Berger in order to elicit payment. (*Id.* at 55–57). The uncontroverted evidence shows that even after Artmark received bounced checks, Artmark's response was simply to telephone Berger and obtain replacement checks. (*Id.* at 55). Artmark did not take any other action. (*Id.*). For example, Artmark did not stop any shipment or cancel any orders. It is further undisputed that Artmark continued to do business with Berger even after the bankruptcy filing. (*Id.* at 62).

Finally, courts will also consider whether there was any evidence presented to show that the defendant took any unusual action to collect payment. *See Lan Yik, supra,* at 112; *Rave Communications, supra,* at 373. Here, too, the record is devoid of any evidence that Artmark demanded COD payments, add on payments or accelerated payments from Berger. (Tr. D2 at 69–70, Tr. D1 at 148). There is no evidence that Artmark took any unusual action to collect payment from Berger. To the extent that Artmark sought to paid by Berger in the preference period, as testified to by Glusky and Meltzer, their testimony just shows that Artmark requested to be paid for past due invoices.[10] This is simply ordinary business practice. *See Rave Communications, Inc.,* 128 B.R. at 373 (concluding that it is not unusual nor inconsistent with the ordinary course of business for a creditor "to urge its customer to pay more promptly"). Thus, we find that no express threats of non-shipment were ever made.[11] Rather, if anything, Artmark was simply requesting, in the ordinary course of business, to be paid.

In sum, we conclude that the parties endured a steady, long-term relation-

9. Berger further contends that this course of payment by Berger was a result of Artmark's pressure tactics as opposed to a normal attempt by Berger to reduce an outstanding balance. This argument by Berger will now be fully addressed.

10. The Court found Glusky's testimony regarding Artmark's payment demands, at times, contrary or inconsistent with his earlier sworn affidavit (Def.Ex. K; Tr. D1 at 132–133) and portions of his deposition testimony. (*Id.*). Meltzer's testimony was also unreliable and not helpful in that he did not have any specific recollections of conversations that occurred in connection with Berger, especially those concerning demands for payment. (Tr.

D2 at 11, 35–36). Notwithstanding the *de minimis* credibility of these two witnesses, and viewing, instead, their testimony in a light most favorable to the Debtor, the cumulative thrust of their testimony merely demonstrated that Artmark requested to be paid and not more.

11. Alternatively, Berger requests this Court to find such threats through "implication." We decline to do so since Berger has failed to present any substantive, testimonial or direct evidence to rebut Artmark's showing that the transfers were made in the ordinary course of business.

ship during which Artmark liberally permitted late payments from the Debtor. No evidence was presented to deem Artmark's relationship with the Debtor as "abnormal." In the context of all the facts and circumstances, the court finds that Artmark did not alter its normal collection practices, initiate or threaten legal action, or exhibit any unusual behavior designed to improve its position over other creditors. Therefore, Artmark has satisfied its burden under Section 547(c)(2)(B) in demonstrating that the payments in dispute were made by Berger in the ordinary course of business between Artmark and Berger.

■■■ The final element that must be established in order to avoid a preference based upon the ordinary course of business exception is that the subject payments must have been made according to ordinary business terms. 11 U.S.C. § 547(c)(2)(C). This section requires objective proof that the subject payments were ordinary in relation to the prevailing practices in the creditor's industry. *Roblin*, 78 F.3d at 41; *Lan Yik*, 185 B.R. at 114. In *Roblin*, the Second Circuit concluded that the objective evidence must include conduct of other, unrelated parties in similar situations that are confronted with similar problems. *Roblin*, 78 F.3d at 42–43; *see Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1048 (4th Cir.1994) ("subsection C requires [the Court] to look to the norm in the creditor's industry when determining whether preference payments were made according to ordinary business terms"). A court's focus is placed on the practices of the creditor's competitors. *Roblin*, 78 F.3d at 42–43 (evidence of the debtor's relationship with other creditors, by itself, is not representative of industry practice); *In re Midway Airlines, Inc.*, 69 F.3d 792, 795 (7th Cir.1995).

■■■ In the instant case, Kiernan testified that he has worked in the industry for over twenty years and throughout this time, he has gained personal knowledge of the payment terms and collection practices of Artmark's approximately twenty-five competitors. (Tr. D2 at 64, 66–67). Kiernan specifically stated that during the period of time that Artmark and Berger conducted business, other companies, including The William Powell Company, the Watts Regulator and WASCO Hardfacing, paid Artmark late. (*Id.* at 64–65). Artmark tolerated these late payments because they were and are good customers. (*Id.* at 64). Moreover, Artmark has competitors both domestically and internationally, who commonly accept delinquent payments, which is another reason to tolerate late payments. (*Id.* at 64–65).

Indeed, as Kiernan testified, "Delinquent payments are so standard today that computerized forms show current, zero to 30 days late, 31 to 60 days late, 60 to 90 days late. That is how common practice it is when form manufacturers have standardized forms showing delinquent payments." (*Id.* at 67). Kiernan further testified that he has learned in the past twenty-five years from his customers that his competitors tolerate slow payments and that his customers use this information when negotiating terms with Artmark. (*Id.*).

Willhoite, Artmark's Vice President for sales and marketing since 1998, also testified. Before joining Artmark, Willhoite was employed by a customer of Artmark, The William Powell Company, for over thirty-five years. (*Id.* at 96–97). Willhoite testified that The William Powell Company was a slow payer of Artmark. (*Id.* at 96). Willhoite identified other suppliers who provided imported parts to The William Powell Company and stated that The William Powell Company was a slow payer of

these suppliers as well. (*Id.* at 97). The practice was tolerated because The William Powell Company was a good company and it was standard practice that they would pay slow. (*Id.*).

With respect to his employment at Artmark, Willhoite testified that the accounts that he deals with are slow paying. (*Id.* at 98). Artmark tolerates slow payment because there is good business potential and it is simply standard business practice. (*Id.*). The court found Willhoite to be a highly credible and knowledgeable witness; he answered questions in a direct and straightforward manner.

Berger did not refute Kiernan or Willhoite's testimony that the norm of the industry was to accept late payments. Berger did not proffer any testimony or other evidence that it was not a slow payer and that the standard in its business was to pay on time. Instead, Berger argues in its post-trial submission that there is an absence of proof, *i.e.*, expert testimony, evidencing that Artmark's collection practices were similar to those in the industry. (Berger's Memorandum at 16). We disagree. Willhoite's testimony offered the court specialized knowledge acquired by the witness during the course of his thirty-five years in the industry.[12] Significantly, Willhoite not only is and was intimately familiar with the workings of Artmark and their competitors in the industry but he also provided the insight of another "late payer" in the industry. As a result, the court found Willhoite's testimony helpful, reliable, and informative.

Accordingly we find that the evidence adduced at trial sufficiently establishes that it was the ordinary practice for suppliers of industrial components to permit late payments from regular, long-term customers and that Artmark demonstrated conformity with that practice. Thus, Artmark has sustained its burden of proof with respect to the final element, that the subject payments were made according to ordinary business terms pursuant to Section 547(c)(2)(C).

## CONCLUSIONS OF LAW

1. Artmark has sustained its burden of proof regarding all three elements of an ordinary course of business defense: (1) that the transfer was in the payment of a debt incurred by Berger in the ordinary course of business between Berger and Artmark; (2) that the transfer was made in the ordinary course of business of Berger and Artmark; and (3) that the transfer was made according to ordinary business terms.

2. Artmark has established that the principal sum of $55,029.37 in preferential payments is excepted from avoidance pursuant to 11 U.S.C. § 547(c)(2) and, as a matter of law, may not be recovered.

**AN ORDER IN CONFORMITY WITH THESE FINDINGS OF FACTS AND CONCLUSIONS OF LAW IS BEING**

---

12. *See, e.g., In re Midway Airlines*, 69 F.3d 792 (7th Cir.1995) (testimony from employees to establish prevailing industry practice may be adequate provided it is based on personal knowledge); *In re Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir.1993) (expert testimony is not a prerequisite or even necessary to illustrate industry practices, and the personal knowledge of the creditor's executive vice-president was sufficient to show industry practice); *McCarthy v. Navistar Fin. Corp.* f/k/a *Int'l Harvester Credit Corp., et al. (In re Vogel Van & Storage, Inc.)*, 210 B.R. 27 (N.D.N.Y.1997) (expert testimony is not necessary to establish industry practice); *Lan Yik*, 185 B.R. at 114–115 ("self-serving testimony may suffice to prove what 'ordinary business terms' are for a particular industry when there is no evidence to the contrary, and endorses the Seventh Circuit's conclusion in ... *Tolona Pizza* ...").

ENTERED SIMULTANEOUSLY
HEREWITH